## S03A1604. HAMMOCK v. THE STATE.
### (592 SE2d 415)

FLETCHER, Chief Justice.

Cherry Hammock appeals from her convictions for felony murder and possession of a firearm during the commission of a felony.[1] Hammock contends that her right to confrontation was violated when a juror gathered extra-judicial information on a key issue in the case and relayed it to the other jurors. Because there is a reasonable possibility that the juror's misconduct contributed to Hammock's conviction, we reverse.

1. The evidence at trial showed that Hammock returned home from a trip on Saturday, September 22, 2001 to find that the victim, her husband, had destroyed memorabilia from their wedding and had left her a vulgar note demanding that she move out of the house. On the advice of police, Hammock spent the weekend at her son's house. Knowing that the victim had physically abused his ex-wife, Hammock made a Monday morning trip to the Crawford County Magistrate Court in search of legal protection. Because no magistrate judge was on duty, the clerk of court instructed Hammock to fill out a pre-warrant application and scheduled a hearing for two weeks later. In the meantime, the clerk encouraged Hammock to see an attorney about obtaining a restraining order. Hammock saw an attorney later that day, who informed her that obtaining a restraining order would be difficult. He instead advised her to return home to stake claim to the house in case she filed for divorce.

When Hammock arrived home, the victim was out. When he returned around 9:00 p.m., Hammock locked herself in the master bedroom and propped a chair under the door handle. Over the next several hours, the victim intermittently banged on the bedroom door,

---

[1] The crimes occurred on September 25, 2001. On February 27, 2002, Hammock was indicted for malice murder, felony murder, and possession of a firearm during the commission of a felony. On August 29, 2002, a Crawford County jury convicted her on the felony murder and possession counts but acquitted her of malice murder. Hammock was sentenced to life in prison for the felony murder and to five consecutive years for the possession. She filed a timely motion for new trial on September 6, 2002, which she amended on December 18, 2002. A hearing on her amended motion was held on December 20, 2002, followed by briefs from both sides. The trial court denied Hammock's amended motion on April 3, 2003. She filed a timely notice of appeal on April 10, 2003. Her case was docketed in this Court on July 18, 2003 and orally argued on October 21, 2003.

yelled at Hammock to leave the house, threatened to break down the door, and threatened to burn the house and all her belongings. Around 1:00 a.m., the victim kicked down the bedroom door. When Hammock told him to stop and that she had been to the magistrate judge to apply for a warrant, the victim said that if he were arrested Hammock would be sorry. The victim continued to come towards Hammock and said that he was going to "teach her a lesson." Hammock shot him once in the chest, killing him.

The jury was charged on justification but rejected it. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Hammock was guilty of the crimes for which she was convicted.[2]

2. Hammock contends that a juror who relayed extra-judicial information to the other jurors during deliberations became an unsworn witness against her in violation of her Sixth Amendment rights to confrontation and cross-examination.

Defendants have a constitutional right to confront and cross-examine witnesses against them, and this right is fundamental to a fair trial.[3] That right is violated when a juror gathers and relays extra-judicial information that is "so prejudicial that the verdict must be deemed 'inherently lacking in due process.' "[4] Stated differently, a new trial will be granted if "there is a reasonable possibility that the improper evidence collected by jurors contributed to the conviction."[5]

Hammock contends that she acted in self defense. She told police that she was sitting on the floor at the side of the bed farthest from the door and shot the victim not when he first broke down the door, but only when he was coming towards her and threatening her. Thus, the distance of the victim from Hammock at the time of the shooting was an important issue in her defense. In cross-examining the State's medical and ballistics experts, Hammock elicited testimony that the best way to determine the distance was by comparing the physical evidence with controlled ballistics tests, and that those tests revealed that the victim was at most three and one-half to four feet from Hammock when she shot him. The State's blood splatter expert testified that, based on the blood splatter pattern, the victim had to be on the far side of the bed from Hammock and not within three to four feet. On cross-examination, the expert admitted that he had not measured the width of the bed, and that this left him unable to determine pre-

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] *Watkins v. State*, 237 Ga. 678, 684-685 (229 SE2d 465) (1976).

[4] *Williams v. State*, 252 Ga. 7, 9 (310 SE2d 528) (1984).

[5] *Bobo v. State*, 254 Ga. 146, 146 (327 SE2d 208) (1985).

cisely how far the blood splatter evidence would put the victim from Hammock at the time of the shooting.

Linda Vines, a juror at Hammock's trial, testified at the hearing on Hammock's motion for a new trial that another juror measured the dimensions of her own bed to fill in the gap left by the blood splatter expert's testimony. Vines testified that the juror conveyed the results of her test to the other jurors, and that the victim's location at the time of the shooting was a central issue during deliberations. Vines also testified that on the first day of deliberations, before the other jurors learned of the independent measurements, there was no unanimous verdict, but on the second day, after hearing this information, the jury unanimously found Hammock guilty.

The present case is very similar to *Bobo v. State*,[6] in which this Court reversed a conviction after two jurors gathered extra-judicial information on the dimensions of a crime scene. As in the present case, the dimensions in *Bobo* were a " 'central issue in the case.' "[7] Also as in the present case, the verdict in *Bobo* only became unanimous after the jury learned of the extra-judicial information.

We reversed Bobo's conviction because we concluded that "there [was] at least a reasonable possibility that the reports by [the jurors] contributed to the conviction, and that the verdict must therefore be deemed inherently lacking in due process."[8] Similarly, because the juror's misconduct in the present case affected the key issue of self defense and the verdict became unanimous only after the introduction of the improper evidence, we conclude that there is a reasonable possibility that the juror's misconduct contributed to Hammock's conviction.

3. Hammock also claims that the trial court erred in refusing to charge the jury on the defense of habitation. OCGA § 16-3-23 provides that deadly force can be used to prevent or terminate an unlawful entry into or attack upon a person's habitation if:

> (1) The entry is made or attempted in a violent or tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;
> (2) That force is used against another person who is not a member of the same family or household and who unlawfully and forcibly enters or has unlawfully and forcibly

---

[6] 254 Ga. at 146.
[7] Id. at 147.
[8] Id. at 148.

entered the residence . . . ; or
  (3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

Unlike the defense of justification,[9] the habitation defense, in recognition of the sanctity of a person in his home, allows the use of deadly force in certain situations even if the occupant does not fear death or great bodily injury.

We must first determine whether the statute permits the habitation defense when the victim and defendant share the same home. Subsection (2), added in 2001,[10] expressly excludes application of the defense between members of the "same family or household." Subsections (1) and (3), however, do not contain such limiting language. With the aid of two well-known and related principles of statutory construction: *expressio unius est exclusio alterius* (expression of one thing implies exclusion of another) and *expressum facit cessare tacitum* (if some things are expressly mentioned, the inference is stronger that those not mentioned were intended to be excluded), we conclude that the lack of limiting language in subsections (1) and (3) shows the legislature's intent to allow these subsections to apply between co-inhabitants.[11] This is likely because subsections (1) and (3) require the occupant to reasonably believe that the intruder will commit an assault or felony in the habitation, and that deadly force is necessary to prevent the assault or felony, before he is justified in using deadly force. Subsection (2), on the other hand, only requires the occupant to know that an unlawful entry has occurred before he is justified in using deadly force.

Having determined that OCGA § 16-3-23 (1) and (3) may apply between co-inhabitants, the question becomes whether they should have been charged to the jury in the present case. The unique aspect of this case is that Hammock does not claim the entire house as her habitation – only the master bedroom. She claims that her habit of routinely locking the victim out of the bedroom in the weeks leading up to the shooting established the bedroom as her habitation.

OCGA § 16-3-24.1 defines "habitation" as "any dwelling, motor

---

[9] See OCGA § 16-3-21 (a):
  . . . a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.
[10] Ga. L. 2001, p. 1247, § 2.
[11] See *Hogan v. Nagel*, 273 Ga. 577, 578 (543 SE2d 705) (2001); *Morton v. Bell*, 264 Ga. 832, 833 (452 SE2d 103) (1995).

vehicle, or place of business." Black's Law Dictionary defines a "dwelling-house" as "a building, *a part of a building*, a tent, a mobile home, or another enclosed space that is used or intended for use as a human habitation."[12] In *Huff v. State*, the Court of Appeals of Georgia held that a habitation could consist of a room in a boarding house.[13] The defendant in *Huff*, the boarding house operator, shot the victim, a boarder, after the victim forcibly entered her bedroom and attacked her. The court found that, because of the uniqueness of the boarding house arrangement, the victim's "own bedroom was his habitation, and no other guest of the house was entitled to go there without his invitation. And so it was with the defendant's bedroom."[14]

We find the reasoning in *Huff* to be sound. Therefore, we hold that for purposes of OCGA § 16-3-23, a person's habitation can be a particular space in a jointly-occupied dwelling provided that such person has obtained the right to occupy that space and exclude his co-inhabitants therefrom.

Such a right can be established by court order, such as when a court order divides a house into separate living spaces for a husband and wife pending finality of their divorce. It can also be obtained by clear agreement, such as by lease or rental agreement. We need not decide whether there are situations when such right can be established by a course of conduct. We hold that in the present case, the fact that Hammock sometimes locked herself in the master bedroom in the weeks preceding the shooting was insufficient to establish a clear agreement between herself and the victim that the victim could not enter the bedroom. Therefore, the bedroom was not Hammock's habitation, and the victim's breaking down the bedroom door was not an unlawful entry into or attack upon Hammock's habitation. Accordingly, the trial court did not err by refusing to charge the jury on the defense of habitation.

4. Hammock's final contention is that the jury should have been recharged on justification at the time it requested a recharge on felony murder. Because this issue is unlikely to occur in any retrial, we will not address it.

*Judgment reversed. All the Justices concur.*

DECIDED FEBRUARY 2, 2004 —
RECONSIDERATION DENIED FEBRUARY 27, 2004.

*Hogue & Hogue, Laura D. Hogue, Franklin J. Hogue, Buford & Buford, Floyd M. Buford, Jr.*, for appellant.

---

[12] BLACK'S LAW DICTIONARY 524 (7th ed. 1999) (emphasis supplied).
[13] 113 Ga. App. 257, 260-261 (147 SE2d 840) (1966).
[14] Id. at 261.

*Howard Z. Simms, District Attorney, Wayne G. Tillis, Assistant District Attorney, Thurbert E. Baker, Attorney General, Brian K. Gorman, Assistant Attorney General,* for appellee.

