315 Ga. 369
FINAL COPY

S22A1187.  BALLINGER v. WATKINS.

PINSON, Justice.

During Joseph Watkins's murder trial, a juror conducted a "drive test" during a break in deliberations to see whether the defendant could have been physically present at the time and place the victim was shot. The next day, the jury voted to convict Watkins of felony murder and other crimes, and he was sentenced to life in prison. Years later, Watkins's counsel learned about the juror's misconduct and filed the habeas petition in this case. The habeas court ultimately granted relief on the juror-misconduct claim and two other grounds. We conclude that Watkins has shown that the juror's misconduct caused him actual prejudice—for at least that juror, her drive test "proved" a key and heavily disputed piece of the State's burden of proof against Watkins—and we affirm the grant of habeas relief on the juror-misconduct claim.

1. *Background*

(a) *Trial and Convictions*

(i) On January 11, 2000, Isaac Dawkins was shot once in the head as he was driving his white pickup truck north on Highway 27 from Floyd College, south of Rome, Georgia. He died the next day. The physical evidence of the crime was limited: a lead bullet core recovered from Dawkins's body during the autopsy, a 9mm cartridge case found near the crime scene, and a bullet fragment found inside Dawkins's car that had markings consistent with having been fired from a 9mm firearm. No firearm was found.

On the evening of the shooting, Wayne Benson was also driving north on Highway 27. He noticed a small blue car driving erratically and interacting with a white pickup truck about a half mile north of Floyd College. After losing sight of the vehicles "[f]or a few minutes" and traveling about a mile to a mile-and-a-half down the road, Benson saw a "flash of some kind" before the white truck drove across the median, into southbound traffic, and then onto the far shoulder. Benson pulled over and called 911 to report the accident,

and emergency services were dispatched at 7:19 p.m. No one else witnessed the incident or reported a vehicle interacting with the white truck.[1]

(ii) During that same time, Watkins allegedly was at home in northeast Floyd County, getting ready to drive to see his girlfriend, who lived 45 minutes south in Cedartown. While getting into his own white pickup truck, Watkins called his girlfriend at 7:15 p.m. The call lasted for 4 minutes and 23 seconds and originated in an area covered by the Kingston cell tower—the only cell tower that covered Watkins's house. Watkins's girlfriend testified that he arrived in his white pickup truck at her house—south of the crime scene—around 8:00 p.m.

The parties' expert witnesses agreed that Watkins's cell phone could not have been located at or near Floyd College when Watkins

---

[1] One other witness, Barry Mullinax, a jailhouse informant who spent time with Watkins's co-defendant Mark Free at a diversion center, also claimed to have seen the accident, but his testimony not only was internally inconsistent but also contradicted a statement he previously gave to investigators after the accident; it appeared that he was actually describing a different shooting that occurred on Highway 20 West around the same time.

called his girlfriend at 7:15 p.m. because that area was not covered by the Kingston cell tower. The parties' experts relied on maps and models of various cell towers in the area when explaining their opinions to the jury. The maps, which included shaded areas corresponding to the different cell towers, did not show the exact bounds of the cell towers based on street names or the exact location of the crime. Neither expert witness was able to provide an exact street location where the Kingston cell tower's coverage ended.

The State argued at trial that Watkins still could have been physically present at the scene when Dawkins was shot (just before Benson's 911 call at 7:19 p.m.). The State explained that Watkins could have made the phone call at 7:15 p.m. from the absolute last point within the Kingston tower's coverage while driving south toward the crime scene,[2] then turned around into the northbound lanes (the direction in which Dawkins was traveling) and arrived at

---

[2] Although the expert witnesses had not identified an exact point where the Kingston cell tower's coverage ended, the State pointed to the intersection of Chulio Road and Highway 411 as the starting point from where Watkins could have driven to the crime scene while calling his girlfriend.

the crime scene, all in the four minutes between the call to his girlfriend and the emergency-services dispatch from Benson's 911 call. Based on this theory, Watkins then would have needed to turn around again to continue driving south to his girlfriend's house and arrive there within 45 minutes of the call he placed to her at 7:15 p.m. No evidence about distances or travel times between the relevant locations was presented. The State's theory also did not account for the fact that Watkins arrived at his girlfriend's house in his white pickup truck but the only eyewitness saw a blue car interact with Dawkins's truck.

Defense counsel argued that Watkins's phone call could not have been initiated from where Benson saw the blue car first interacting with Dawkins's truck near Floyd College. Both parties' expert witnesses agreed. Given the 7:15 p.m. phone call, defense counsel argued that Watkins simply could not have been in the blue car at the relevant times and locations.

(iii) The State's theory of the case was that Watkins "despised Isaac Dawkins" because Dawkins had dated Watkins's ex-girlfriend,

and much of the testimony presented by the State concerned various incidents and arguments between Dawkins and Watkins. The State also presented testimony from a number of witnesses about incriminating statements made by Watkins, but nearly all of those witnesses were heavily impeached.[3]

The State also sought to link Watkins to Dawkins's shooting by presenting the jury with evidence about two deceased dogs. The first dog was the Dawkins family's pet, which was shot between the eyes

---

[3] For example, Tiffany Sledge testified that Watkins said he "would get that son-of-a-b***h, Isaac, if it was the last thing he had to do and kill him," but she was Watkins's former co-worker who the jury could have believed cut a deal to testify to benefit her boyfriend who was facing drug charges. Winford Ellis, a jailhouse informant, allegedly told the State earlier that Watkins was "laughing because [investigators] were out diving in Swan Lake all day, you know, dragging the lake" when Watkins said "[the murder weapon is] in a lake but it's not in that lake," but Ellis denied making these statements at trial and said he had made it all up. Corey Jacobs, who was in jail at the time of Watkins's trial, said he overheard Watkins "just bragging about shooting Isaac" in a home improvement store's parking lot, but he also said he attended Pepperell High School with Watkins, yet Watkins did not attend Pepperell. Josh Flemister had previously told police officers that Watkins told him to say that Watkins was with him all day the day of the shooting, but he testified at trial that he made that up, explaining that the police intimidated him because he was underage and drunk at the police station. And Chad Redden, who was dating Watkins's and Dawkins's ex-girlfriend at the time and previously dated Watkins's sister, said Watkins "told me if I had waited a couple of more months [before talking to the police] for him to get out of all this trouble, I would end up just like Isaac."

and killed while chained in a pen in Dawkins's back yard about three months before Dawkins's death. Two witnesses testified that they had heard from Watkins's co-defendant, Mark Free, that Watkins was involved in the shooting of the dog. Free denied making either statement.

The second dog was found by Dawkins's father several months after his son's death. While visiting Dawkins's grave, his father found a trash bag containing the remains of an unknown deceased dog about 15 feet away from the grave that, based on the presence of flies and a bad odor around the remains and around the grave, seemed like it had previously been placed on Dawkins's grave. Like Dawkins's dog, the dog on the grave had been shot between the eyes. The only evidence presented at trial potentially connecting the second dog to Watkins was the testimony of a jailhouse informant discussing a conversation he had with Free about the dogs, and Free again disputed that testimony.

(iv) The jury found Watkins not guilty of malice murder, but guilty of felony murder predicated on aggravated assault,

aggravated assault, possession of a firearm during the commission of a crime, and stalking. He was sentenced to serve life in prison for felony murder, five years consecutive for the possession count, and 12 months for stalking.

After his motion for a new trial was denied, Watkins appealed, challenging the sufficiency of the evidence and certain evidentiary rulings. This Court affirmed his convictions and sentences. See *Watkins v. State*, 276 Ga. 578 (581 SE2d 23) (2003).

(b) *Initial Post-Conviction Proceedings*

In 2004, Watkins filed a state habeas petition raising claims of actual innocence and ineffective assistance of counsel. The habeas court denied Watkins's petition in 2011, and this Court denied his application for a certificate of probable cause to appeal. See *Watkins v. Martin*, Case No. S12H0816 (Oct. 15, 2012). Watkins then brought the same claims in a federal habeas petition, which the district court denied. The United States Court of Appeals for the Eleventh Circuit in turn denied his request for a certificate of appealability.

(c) *Second State Habeas Petition*

8

(i) In 2017, Watkins filed a second state habeas petition, raising three claims based on evidence newly discovered by his legal team: (1) a juror-misconduct claim based on an independent drive test conducted by a juror to test the State's theory against the cell-phone evidence presented; (2) a *Brady*[4] claim based on a .22-caliber bullet that was found inside the dog found near Dawkins's grave but never turned over to the defense team; and (3) a *Napue*[5] claim based on false or misleading testimony that the State allowed one of its witnesses to give, which omitted information about the .22-caliber bullet found in the same dog.[6] The State moved to dismiss and, after a non-evidentiary, argument-only hearing, the habeas court dismissed Watkins's petition as untimely and successive. Watkins applied to this Court for a certificate of probable cause to appeal, which the Court granted. See *Watkins v. Ballinger*, Case No. S19H0061 (July 1, 2019). On appeal, this Court concluded that the

---

[4] See *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

[5] See *Napue v. Illinois*, 360 U.S. 264 (79 SCt 1173, 3 LE2d 1217) (1959).

[6] Watkins initially raised two additional claims—one based on an alleged drive test conducted by the Fulton County Police Department and one based on ineffective assistance of counsel—but both claims were abandoned.

habeas court had erred in dismissing the petition on procedural grounds because Watkins "alleged facts showing grounds for relief which could not reasonably have been raised in his original habeas petition and which could not have been discovered by the reasonable exercise of due diligence." *Watkins v. Ballinger*, 308 Ga. 387, 397 (2) (840 SE2d 378) (2020). We thus reversed the dismissal order and remanded the case for further proceedings. See id.

(ii) On remand, the habeas court held a three-day evidentiary hearing. Among other evidence, Watkins presented the testimony of Juror Rogena Cordle. Cordle testified that she had been confused by the cell-phone evidence presented at trial. So, after the first day of deliberations on Saturday, despite the trial court's explicit instructions to not "go measuring distances or stopping by the scene and investigating on your own,"[7] she decided to do a drive test to see whether Watkins could have arrived at the scene of the crime around the time Dawkins was shot—7:18 or 7:19 p.m. based on the

---

[7] Cordle testified that she either did not remember or did not hear this admonition.

time of the emergency-services dispatch from Benson's 911 call—after making the phone call to his girlfriend from the Kingston tower's coverage area at 7:15 p.m.

The next day, a Sunday, Cordle used her car clock to time how long it took her to drive northbound on Highway 27 from the area of the crime to the intersection of Chulio Road and Highway 411. As Cordle acknowledged at the habeas hearing, she drove the route backward from end point to start point, her car clock did not indicate seconds, and she did not account for the time that it would have taken for Watkins to turn around from traveling south through the edge of the (supposed) Kingston cell-tower coverage area to head back north in the direction of the crime. Nor did she account for the testimony that the shooter had been seen traveling from the south in tandem with Dawkins for "a few minutes" and at least a mile before the shooting. And she did not know exactly where the crime had occurred or where the Kingston cell tower's coverage ended. Nonetheless, based on her drive test, she determined that Watkins could have been where Dawkins was shot at the relevant time.

On Monday morning, the day after Cordle's drive test, the jury voted to convict Watkins. While Cordle testified that she did not remember telling other jurors about her drive test, she said it was "possible" she told Watkins's legal team in 2017 that she had told a male juror about her test. But she affirmatively testified that she "kn[e]w [she] told another male juror on Monday morning that I thought that it was possible that [Watkins] could have traveled the distance in the allotted time."

Juror Rosemary Munton Evans, who testified that she suffered memory loss following a recent heart attack, "[v]ery vaguely" remembered telling Watkins's legal team in July 2021 that a female juror told her that she had done a drive test during a break in the deliberations. Juror Kandy Brown testified that she did not remember much about the case, but "I just remember somebody said they did an independent study," although she could not recall if the person was male or female. Juror Steven Broome did not recall anything about a juror conducting an independent investigation, but he also misremembered key details about the case. Juror Alice

12

Pearson also had no recollection of a juror saying she had done her own experiment.

(iii) In April 2022, the habeas court granted Watkins's habeas petition on three grounds: (1) Cordle's drive test and her reporting of its results to other jurors violated Watkins's due-process and confrontation rights; (2) the prosecution failed to disclose exculpatory evidence in violation of *Brady*; and (3) the prosecution presented and failed to correct false or misleading testimony in violation of *Napue*.

As a threshold matter, the habeas court found that these claims were neither untimely nor barred by Watkins's failure to raise them in his prior habeas petition. See OCGA § 9-14-51. A habeas petition may be filed within four years from "[t]he date on which the facts supporting the claims presented could have been discovered through the exercise of due diligence," OCGA § 9-14-42 (c) (4), and grounds raised for the first time in a second or successive habeas petition are not waived if the court "finds grounds for relief asserted therein which could not reasonably have been raised in the

13

original or amended petition," OCGA § 9-14-51. As relevant here, the court found that Watkins had no reason to have known about Cordle's drive test—the factual predicate for his juror-misconduct claim—before his counsel learned about it in July 2016, and he filed the petition within a few months, so the claim "could not reasonably have been raised" in his original habeas petition, and his second petition was filed well within four years from the date on which the factual predicate could have been discovered through the exercise of due diligence.

On the juror-misconduct claim, the habeas court concluded that Watkins had established a violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Section I, Paragraphs I and XIV of the Georgia Constitution. The court explained that "it is clear that the evidence derived from [Cordle's] drive test constitutes extraneous information," which "was considered by her while deliberating the verdict and was likely considered by the other jurors who learned about it too." The court next reasoned that, although prejudice from

14

such juror misconduct would be presumed on direct appeal, Watkins was required to show actual prejudice in a habeas proceeding. The court ultimately determined that Watkins established actual prejudice. First, the court found that the extraneous information was obtained from a test designed specifically by the juror to test critical evidence, which was conducted against explicit instructions from the trial court and was also "riddled with inaccuracies." Second, the court found that the information did reach the jury, citing the testimony of Cordle, who herself acknowledged that she had told a male juror either about the drive test or how her opinion had shifted based on her drive test, and the testimony of the two jurors who remembered hearing about another juror conducting an "independent study." Finally, the court found that the State's case "was far from overwhelming," which also weighed in favor of finding actual prejudice. Based on this review, the court concluded that Watkins established that he was actually prejudiced by the extraneous evidence, and so the court granted him a writ of habeas corpus based on his juror-misconduct claim.

The State appealed.

2. *Analysis*

In reviewing the grant of a petition for habeas corpus, we accept the habeas court's factual findings and credibility determinations unless they are clearly erroneous, and we independently apply the law to the facts. See *Luckie v. Berry*, 305 Ga. 684, 691 (2) (827 SE2d 644) (2019). For reasons we explain below, we agree with the trial court that Watkins's juror-misconduct claim warrants habeas relief. We thus affirm on that basis, so we need not address the other two grounds on which relief was granted.

(a) We start with a brief preliminary matter: whether Watkins's juror-misconduct claim is properly addressed in a habeas corpus proceeding. Our statute governing post-conviction habeas corpus, OCGA § 9-14-42, limits the kinds of claims a petitioner may bring in a habeas petition. To seek habeas relief under that statute, a petitioner must assert "that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of this state." OCGA § 9-14-42

(a).

Watkins's juror-misconduct claim fits that bill. Not every instance of juror misconduct is necessarily an error of constitutional dimensions. See, e.g., *Smith v. Phillips*, 455 U.S. 209, 217 (II) (102 SCt 940, 71 LE2d 78) (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). But Watkins claims that a juror gathered information from outside the trial—we have typically called this information "extra-judicial" or "extraneous"— which was prejudicial to Watkins's defense and brought it into the jury room. This particular kind of juror misconduct can violate a defendant's "right to confront and cross-examine witnesses against [him]" under the Sixth Amendment to the United States

Constitution, which applies to the States through the Due Process Clause of the Fourteenth Amendment. *Hammock v. State*, 277 Ga. 612, 613 (2) (592 SE2d 415) (2004). See *Parker v. Gladden*, 385 U.S. 363, 364 (87 SCt 468, 17 LE2d 420) (1966) (explaining that the Sixth Amendment was "made applicable to the States through the Due Process Clause of the Fourteenth Amendment").[8] We have explained that the constitutional right to confront witnesses is implicated by jurors who do extra-judicial research—like visiting the crime scene—because they "bec[o]me, in a real sense, unsworn witnesses

---

[8] Federal cases are in accord. See *Parker*, 385 U.S. at 364-365 (holding that a bailiff's statements to several jurors regarding the defendant's guilt were prejudicial and violated the defendant's rights of confrontation and cross-examination); *Ward v. Hall*, 592 F3d 1144, 1175 (II) (E) (11th Cir. 2010) (explaining that a jury's use of extra-judicial information—here, a bailiff's response to a juror about whether life in prison without parole was a sentencing option—violates the Sixth Amendment because "[i]ntegral to th[e Sixth Amendment] right is the requirement that a jury base its verdict on the evidence presented at trial"); *Oliver v. Quarterman*, 541 F3d 329, 334 (III) (A) (5th Cir. 2008) (noting, in the context of a juror reciting passages from the Bible on obeying the law and punishing murderers to a small group of jurors during deliberations, that external influences on a jury are a potential violation of the Sixth Amendment); *United States v. Perkins*, 748 F2d 1519, 1533-1534 (IV) (C) (11th Cir. 1984) (noting that "[t]he [S]ixth [A]mendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial," where a juror stated during deliberations that he knew the defendant and disputed the defendant's testimony of where a person relevant to the trial lived).

against the [defendant] in violation of the Sixth Amendment." *Watkins v. State*, 237 Ga. 678, 684 (229 SE2d 465) (1976) (relying on *Parker*, 385 U.S. at 364). And "'the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial.'" Id. (quoting *Parker*, 385 U.S. at 365). See also id. at 685 ("[T]he intentional gathering of extra judicial evidence, highly prejudicial to the accused, by members of the jury and the communication of that information to the other jurors in the closed jury room is inimical to our present jury trial system."). So Watkins has asserted a constitutional claim that is cognizable in habeas.[9]

(b) A constitutional claim grounded in jurors' exposure to extra-judicial information ultimately turns on whether the defendant was prejudiced by the exposure. See *Hammock*, 277 Ga. at 613 (2) ("[A defendant's] constitutional right to confront and cross-examine witnesses against [him] . . . is violated when a juror gathers and

---

[9] The State conceded at oral argument that the alleged juror misconduct here rose to the level of a constitutional violation if the habeas court's factual findings were upheld.

19

relays extra-judicial information that is so prejudicial that the verdict must be deemed 'inherently lacking in due process.'" (citation and punctuation omitted)); *Ward v. Hall*, 592 F3d 1144, 1178-1180 (II) (E) (11th Cir. 2010) ("ultimate inquiry" for claim that juror was exposed to "extraneous information" is whether the outside "intrusion affect[ed] the jury's deliberations and thereby its verdict" (punctuation omitted) (quoting *United States v. Olano*, 507 U.S. 725, 739 (III) (113 SCt 1770, 123 LE2d 508) (1993))). In this context, we have said that "a new trial will be granted if 'there is a reasonable possibility that the improper evidence collected by jurors contributed to the conviction,'" because a verdict based on such extra-judicial information is "'inherently lacking in due process.'" *Hammock*, 277 Ga. at 613-614 (2) (quoting *Bobo v. State*, 254 Ga. 146, 146, 148 (1) (327 SE2d 208) (1985); *Williams v. State*, 252 Ga. 7, 8 (1) (310 SE2d 528) (1984)).

Below, the habeas court placed the burden on Watkins to show actual prejudice, reasoning that although prejudice from a juror's exposure to extra-judicial information would be presumed on direct

20

appeal, see *Harris v. State*, 314 Ga. 51, 53 (2) (875 SE2d 649) (2022), it was Watkins's burden as a habeas petitioner to prove actual prejudice, see *Turpin v. Todd*, 268 Ga. 820, 828 (2) (b) (493 SE2d 900) (1997).[10] Watkins argues before us that he is entitled to a

---

[10] The habeas court's determination that Watkins must prove actual prejudice would seem to be well grounded in a habeas petitioner's typical burden to show both cause and actual prejudice to overcome the procedural bar for claims raised in habeas proceedings. See OCGA § 9-14-48 (d) (providing that habeas relief is unavailable absent "a showing of cause" for the failure to properly assert or preserve claims of error and "actual prejudice"). As we explained in *Greer v. Thompson*, 281 Ga. 419 (637 SE2d 698) (2006), "[e]ven if the law presumes prejudice for certain errors when they are timely raised, a convicted defendant who . . . is seeking to overcome a procedural bar . . . does not have the benefit of that presumption of prejudice, and must instead meet the actual prejudice test." Id. at 421-422 (citation and punctuation omitted). See also *Whatley v. Warden, Ga. Diagnostic & Classification Ctr.*, 927 F3d 1150, 1186 (IV) (B) (2) n.60 (11th Cir. 2019) ("Even outside the ineffective assistance of counsel context, the Supreme Court of Georgia has made clear that 'a convicted defendant seeking to overcome a procedural bar is not entitled to the benefit of a presumption of prejudice that would otherwise apply.' Instead, the defendant must show actual prejudice to overcome the procedural bar." (quoting *Todd*, 268 Ga. at 828 (2) (b))).

We note that below, neither the parties nor the habeas court addressed OCGA § 9-14-48 (d) or the threshold cause-and-prejudice showing it requires to overcome that provision's procedural bar. We see no apparent reason why this showing of cause and prejudice would not be required here. But we need not decide whether that showing was required, or whether the State waived that issue by failing to raise it below or before us. The State does not challenge on appeal the habeas court's conclusion that the juror-misconduct claim could not reasonably have been raised before Cordle's drive test came to light in 2016; that finding would also establish cause. See *Todd*, 268 Ga. at 825 (2) (a) (cause to overcome procedural bar may be established where "the factual or legal basis for a claim was not reasonably available to counsel" at trial or on appeal (citation and punctuation omitted)). And as we explain below, Watkins has established actual prejudice from Cordle's drive test.

21

presumption of prejudice, and that the State had the burden to rebut that presumption by showing that the exposure was harmless beyond a reasonable doubt. But Watkins wins either way: even assuming he must prove actual prejudice to prevail on his juror-misconduct claim, he has.

As a general matter, showing actual prejudice means showing "'not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Todd*, 268 Ga. at 828 (2) (b) (quoting *United States v. Frady*, 456 U.S. 152, 170 (IV) (102 SCt 1584, 71 LE2d 816) (1982)). And specific to juror misconduct, we have explained that a court assessing prejudicial impact properly considers "the type of extrajudicial information at issue (e.g., whether the information concerned sentencing or the underlying substantive law)," "how the extrajudicial . . . information might have been relevant to the issues decided by the jury," and "whether the record evidence suggested that this . . . information would affect the jury's decision on guilt or

innocence." *Harris*, 314 Ga. at 56 (2) n.4 (cleaned up).

Here, the habeas court did not err in concluding that Watkins established actual prejudice from Cordle's unauthorized drive test. That conclusion follows in large part from the drive test's significance in relation to the evidence that was properly before the jury. That evidence showed that Watkins's call to his girlfriend at 7:15 p.m. pinged off of a cell tower that did not cover the crime scene, and the 911 dispatch received the call about Dawkins's shooting at 7:19 p.m. Naturally, this evidence called into question whether Watkins could even have been physically present when Dawkins was shot. The State argued that he could have made it to the crime scene in time if he had made his call just before reaching the southernmost boundary of the cell tower's coverage; traveled for some unknown distance to at least one mile south of the crime scene; turned around to drive north on Highway 27; "interacted" with Dawkins's truck in a blue car while traveling the distance back to the crime scene; and a little later, shot Dawkins before Benson called 911. But no evidence was introduced as to the time, distances, or any

other specifics of this hypothetical route. We need not speculate about whether this was a significant sticking point in the State's case, at least for Cordle: her drive test was designed and carried out specifically to address this key issue. In short, there is little question that the extra-judicial information here was highly pertinent to a critical substantive issue in the case.

Given the significance of the drive test, we cannot say the habeas court erred in concluding that it caused Watkins actual prejudice. Putting aside its serious flaws, the drive test "worked to [Watkins's] actual and substantial disadvantage," *Todd*, 268 Ga. at 828 (2) (b) (citation and punctuation omitted), because it "proved" to at least one juror (Cordle) that Watkins could have been physically present when Dawkins was shot, clearing up and satisfying a key and heavily disputed question of fact necessary to meet the State's burden of proof against Watkins. See *Hammock*, 277 Ga. at 614 (2) (concluding that there was prejudice when a juror sought to "fill in the gap left by the blood splatter expert's testimony" by conducting measurements in her own house similar to those made at the crime

24

scene); *Watkins*, 237 Ga. at 683 (concluding prejudice existed when "two jurors made an unauthorized visit to the scene of the crime and gauged the time it took to drive from there to appellant's house"). That prejudice conclusion gains further support from the sequence of events: deliberations began on a Saturday and concluded without reaching a verdict that evening; Cordle conducted her drive test on Sunday; and on Monday morning, the jury voted to convict Watkins. See *Bobo*, 254 Ga. at 148 (1) (explaining that prejudice was shown in part because "the vote shifted in favor of conviction after the improper evidence was introduced into the deliberations"). Although we cannot know exactly what moved the needle for the jury between Saturday and Monday,[11] this timing is consistent with the conclusion that the extra-judicial information here contributed to

---

[11] Although jurors may testify about whether they were exposed to "extraneous prejudicial information" or any improper "outside influence," they may not testify about "the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith." OCGA § 24-6-606 (b). Consistent with that limitation, the habeas court noted that Watkins did not ask jurors about, and the court expressly did not consider, "the subjective effect of the extraneous evidence on the jury's verdict."

the verdict. See *United States v. Perkins*, 748 F2d 1519, 1534 (IV) (C) (11th Cir. 1984) (noting that "[t]he likelihood of prejudice on a jury is obvious" when "a jury which for many hours had remained hopelessly deadlocked" then reached a verdict after the introduction of the extra-judicial information in question).

The State does not dispute that Cordle conducted the drive test or that she determined, based on that test, that Watkins could have been physically present when Dawkins was shot. Instead, the State argues that the habeas court clearly erred in finding that Cordle *shared* her drive test or its results with the other jurors. But even assuming all of the findings that Cordle shared anything with other jurors were clear error—a doubtful conclusion on this record[12]— Watkins has still shown actual prejudice because there is no dispute

---

[12] As we recounted above, one juror testified at the habeas hearing that she remembered "somebody said they did an independent study." Another testified that she vaguely remembered "[s]omebody talking about [a drive test]." Cordle testified, "I know I told another male juror on Monday morning that I thought that it was possible that [Watkins] could have traveled the distance in the allotted time." And when asked at the hearing if she told anyone about the driving test specifically, she testified, "I don't think I did," but she "may have" previously said that she told a male juror about the drive test. The habeas court found the testimony of these jurors to be credible.

that the extra-judicial information here was introduced to and affected at least one juror: Cordle herself. A guilty verdict in a criminal case requires a unanimous vote, see *Glass v. State*, 250 Ga. 736, 737 (1) (300 SE2d 812) (1983) (explaining that "a criminal defendant has a right to a unanimous jury verdict" unless the defendant waives that right); *Ramos v. Louisiana,* ___ U.S. ___ (140 SCt 1390, 206 LE2d 583) (2020) (explaining that the Sixth Amendment right to a jury trial requires a unanimous verdict to convict a defendant of a serious offense in state court and in federal court), so showing that even one juror based a verdict on extra-judicial information can establish prejudice. See *Turpin v. Todd*, 271 Ga. 386, 389 (519 SE2d 678) (1999) (upholding the habeas court's finding of actual prejudice based in part on the fact that "there was a substantial probability that at least one juror would have voted for life imprisonment" instead of the death penalty but for the improper communication with the bailiff).[13] Just so here.

---

[13] The State cites a handful of decisions in which we rejected juror-misconduct claims based in part on the finding that the juror exposed to extra-

In sum, the habeas court did not err in concluding that Watkins has shown that Cordle's improper drive test caused him actual prejudice. See *Hammock*, 277 Ga. at 614 (2); *Bobo*, 254 Ga. at 148 (1); *Watkins*, 237 Ga. at 683-685. We therefore affirm the habeas court's grant of habeas relief based on Watkins's juror-misconduct claim. Because that ground alone warrants habeas relief, we need not address the remaining grounds on appeal.

---

judicial information did not share it with other jurors. But our holding in each of those cases was grounded in a determination that *no* juror's verdict was affected by the extra-judicial information at issue. See *Burney v. State*, 309 Ga. 273, 292-294 (5) (845 SE2d 625) (2020) (on direct appeal, holding that the State rebutted the presumption of prejudice where a juror who had looked up the definitions of "malice" and "malice murder" on her cell phone did not share the results of her searches with the jury or make any argument about what she read in deliberations, the trial court recharged the jury after the alleged misconduct, and there was no evidence that any of the jurors "relied upon anything other than the court's instructions in reaching their verdicts"); *Hodges v. State*, 302 Ga. 564, 568-569 (4) (807 SE2d 856) (2017) (on direct appeal, holding that the State rebutted the presumption of prejudice from a juror's referring to a dictionary application during deliberations, where the juror testified that the search had no impact on her as a juror, and there was no evidence she shared any of her search results with other jurors); *Pass v. State*, 273 Ga. 534, 535-536 (2) (543 SE2d 719) (2001) (rejecting juror-misconduct claim based on juror seeing a defense witness interacting with the defendant's family members, where all jurors "submitted affidavits that the verdict was based solely on the evidence presented in the courtroom and not on any extra-judicial event," and "there was no intentional gathering of extra-judicial evidence by members of the jury and no showing that what one juror witnessed was communicated to the other jurors").

*Judgment affirmed. All the Justices concur.*

Decided December 20, 2022.

Habeas corpus. Walker Superior Court. Before Judge Thompson.

*Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellant.

*Christina R. Cribbs, Meagan R. Hurley; Benjamin D. Goldberg*, for appellee.