312 Ga. 676
FINAL COPY

S21A0788.  BARRETT v. THE STATE.

BETHEL, Justice.

A Richmond County jury found Shawncy Barrett guilty of the felony murder of Terrence Baker. On appeal, Barrett argues that the evidence presented at trial was insufficient as a matter of due process to support his conviction, that the trial court should have granted him a new trial on the general grounds, and that the trial court erred by admitting a recording of his first custodial interview with law enforcement officials. We affirm.[1]

---

[1] The crimes occurred on February 16, 2016. On May 10, 2016, a Richmond County grand jury indicted Barrett, Brandon Antonio Carter, and Elijah Bernard Washington for malice murder (Count 1), felony murder predicated on armed robbery (Count 2), felony murder predicated on aggravated assault (Count 3), and possession of a firearm during the commission of a crime (Count 4). Carter and Washington were also indicted for possession of a firearm by a convicted felon. The cases were severed for trial. Carter was tried by a jury, convicted of malice murder and two firearm offenses, and sentenced to life in prison without the possibility of parole for malice murder and consecutive five-year terms for each of the firearm offenses. This Court affirmed his convictions and sentences in *Carter v. State*, 308 Ga. 589 (842 SE2d 831) (2020). Washington was tried by a jury and found not guilty as to each count. Their cases are not part of this appeal. At a jury trial held

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Just after 5:00 a.m. on February 16, 2016, an employee of an Augusta Waffle House called 911 to report that she had seen a man who appeared to be dead from a gunshot wound in the parking lot of the restaurant next door. The police responded to the call and found Baker dead from an apparent gunshot wound. It appeared that Baker had been shot from behind and that his body had been moved. The police found $790 in cash in the pocket of Baker's pants. The medical examiner testified that Baker died from a single gunshot wound to the back of his head and that the manner of death was homicide.

Officers obtained video recordings from security cameras maintained by the Waffle House and the restaurant next door. In

from June 11 to 14, 2018, Barrett was found guilty of Count 2 and not guilty of the remaining counts against him. On June 14, 2018, the trial court sentenced Barrett to life in prison without the possibility of parole. On June 19, 2018, Barrett filed a motion for new trial, which he amended through new counsel on April 23, 2019. The trial court denied the motion for new trial, as amended, on February 10, 2020. Barrett filed a notice of appeal on February 21, 2020. This case was docketed to this Court's April 2021 term and submitted for a decision on the briefs.

the recordings, Baker could be seen standing near his Jeep in the Waffle House parking lot and meeting with Barrett and Brandon Carter just before 3:00 a.m. After briefly visiting the Waffle House, Barrett and Carter got into Baker's Jeep. Barrett sat in the front passenger seat, and Carter sat in the back seat. Baker drove into the adjacent parking lot in front of the restaurant next door.[2] The surveillance videos also showed a red Ford Focus hatchback vehicle in that parking lot.

The police obtained cell phone records showing that seven phone calls had been placed between Baker and Elijah Washington in the hours preceding Baker's death. After learning that Baker had communicated with Washington on the night of the shooting, two police investigators went to the apartment complex where Washington was known to live. While the investigators were there, Washington came to the apartment complex driving a red Ford Focus hatchback. The investigators spoke with Washington. As a

---

[2] Baker parked the Jeep in an area that was not in the view of the surveillance cameras.

3

result of that interaction, the police officers identified Barrett and Carter as other possible suspects in Baker's shooting. The investigators also learned that Carter lived in the same apartment complex.

An employee of the apartment complex found two semi-automatic pistols — a Hi-Point .40-caliber pistol and a Smith & Wesson .40-caliber pistol — in a dumpster behind the complex. A firearms examiner testified that a .40-caliber bullet, a bullet fragment, and a .40-caliber cartridge case recovered at the crime scene and during the autopsy of Baker had each been fired from the Smith & Wesson pistol.

Investigator Mitchell Freeman interviewed Barrett on two separate occasions in connection with this case. The first interview took place at the sheriff's office. Barrett was in custody at the time and, after receiving *Miranda*[3] warnings, told Freeman the following: On the night of Baker's shooting, Barrett, Carter, and Washington

---

[3] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

4

went to a bar to buy marijuana. The person they spoke to did not have any, but Baker overheard that conversation and told Barrett that he had marijuana. Barrett, Washington, and Carter later met Baker in the Waffle House parking lot, and Barrett and Carter each gave Baker $20 for marijuana. Barrett said that he, Carter, and Washington rode together in a red car, and Washington remained in the car while Barrett and Carter went into the Waffle House. Barrett said that Washington drove around the parking lot and then parked. Barrett said he, Washington, and Carter smoked the marijuana they got from Baker and that Baker was "fine" when he, Carter, and Washington left the Waffle House parking lot.

Deputy Richard Russell of the Richmond County Sheriff's Office testified that he encountered Barrett in the Richmond County Jail the next day. While Deputy Russell was moving Barrett to a different cell, Barrett said that he "didn't want to do time for anybody else" and asked Deputy Russell if the investigator "just wanted the shooter." Barrett then told Deputy Russell that he wanted to speak with the investigator and that he "should have just

talked to them folks yesterday."

Later that day, Freeman and another investigator interviewed Barrett at the jail. After again receiving *Miranda* warnings, Barrett told the investigators the following. He and Washington met Baker at a bar and discussed buying marijuana. After they agreed to a deal, Baker left to pick up the marijuana. Washington immediately began talking about robbing Baker. Carter was not with them at the time, but they drove to pick him up after leaving the bar. Washington told Carter about the robbery plan. Washington was carrying a .40-caliber Hi-Point pistol, and Carter was also carrying a gun. Once they arrived at the Waffle House, Barrett and Carter got out of the car while Washington drove around the parking lot. Barrett and Carter went inside the Waffle House, and Barrett called Washington to discuss the robbery plan.[4] Baker pulled into the parking lot and made contact with Barrett and Carter. Barrett got in the front seat

---

[4] Barrett said Washington asked him, "whatcha gonna do?" Investigator Freeman testified that it was his impression from Barrett's statement about his call with Washington that Barrett and Washington were discussing a plan for the robbery.

of Baker's car, and Carter got in the back seat. Baker then pulled his car around and parked next to Washington. Barrett said that he was going to give Baker money for his marijuana, but that Carter was going to rob Baker "for the rest of it." During the transaction, Carter shot Baker, who was unarmed. Barrett said that after shooting Baker, Carter pushed Baker out of the car and took marijuana, cash, and a cell phone from Baker. Carter and Barrett got back into Washington's car, and he drove them back to Washington's apartment, where they smoked the marijuana they had stolen from Baker.

(a) Barrett first argues that the evidence presented at trial was insufficient as a matter of constitutional due process to support his conviction for felony murder because the evidence failed to establish the essential elements of the predicate felony, armed robbery. Barrett argues that he had no knowledge of what would occur when he and Carter met with Baker and that the only evidence presented by the State that could support his knowledge that Carter would commit the armed robbery is a statement made by Washington that

he wanted to "rob the guy" and a call between Barrett and Washington that an investigator later characterized as "absolutely" discussing the robbery plan. Barrett claims the investigator's characterization was too speculative to support Barrett's involvement.

When evaluating challenges to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable to the jury's verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson*, 443 U. S. at 319 (III) (B); *Jones v. State*, 304 Ga. 594, 598 (2) (820 SE2d 696) (2018). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts[,]" and we do not reweigh the evidence. *Smith v. State*, 308 Ga. 81, 84 (1) (839 SE2d 630) (2020); see also *Ivey v. State*, 305 Ga. 156, 159 (1) (824 SE2d 242) (2019).

The offense of armed robbery is defined in OCGA § 16-8-41, which provides in relevant part that "[a] person commits the offense

of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" OCGA § 16-8-41 (a). Armed robbery is a felony. See OCGA § 17-10-6.1 (a) (2), (b) (1). And the trial court charged the jury on Georgia's "party to a crime" statute, which provides that "[e]very person concerned in the commission of a crime," including one who "[d]irectly commits the crime" or "[i]ntentionally aids or abets in the commission of the crime[,]" is "a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a), (b) (1), (3). "While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during[,] and after the offense." (Citation and punctuation omitted.) *Boyd v. State*, 306 Ga. 204, 207-208 (1) (830 SE2d 160) (2019).

The evidence presented at trial supported a determination that the armed robbery occurred when marijuana, cash, and a cell phone belonging to Baker were taken from his immediate presence by the

9

use of a gun that Carter was carrying. The evidence further supported a finding that Barrett had knowledge of the plan to rob Baker and that Carter had a gun with him when the two of them got into Baker's car. Barrett told Investigator Freeman and another investigator that he, Washington, and Baker discussed buying marijuana earlier that evening. After they agreed to a deal, Baker left, and Washington immediately began talking about robbing Baker. After that conversation, Barrett and Washington drove to pick up Carter on the way to meet Baker, and Washington told Carter about the robbery plan.[5] After the shooting, Barrett left the Waffle House with Washington and Carter to smoke the marijuana they had stolen from Baker.

---

[5] Barrett attempts to diminish Investigator Freeman's description, based on his interview with Barrett, of a phone call between Barrett and Washington while they were at the Waffle House as mere "speculation as to [Barrett]'s involvement." However, the jury is authorized to make "reasonable inferences to be derived from the facts." *Smith*, 308 Ga. at 84 (1). The jury could thus consider Investigator Freeman's description of the call, based on his impression of Barrett's demeanor and the full context of the interview, along with other evidence of Barrett's involvement, including Barrett's own words, to determine that Barrett knew about the plan for the robbery. Barrett did not object to Investigator Freeman's description of the interview at trial or raise any issue regarding the admissibility of the description on appeal.

Although there is no evidence that Barrett himself committed the armed robbery of Baker, evidence of his involvement in the planning of the robbery as well as his presence, companionship, and conduct with other perpetrators before, during, and after the robbery "was sufficient to authorize a rational jury to find beyond a reasonable doubt that [Barrett] was guilty, at least as a party to the crime[ ] of armed robbery[.]" *Boyd*, 306 Ga. at 208 (1) (a); see also *Heard v. State*, 309 Ga. 76, 82-84 (2) (844 SE2d 791) (2020). Moreover, because the evidence also authorized the jury to find that Baker's death occurred during the commission of that felony, the evidence was sufficient to support the jury's guilty verdict on the felony murder count predicated on armed robbery. See *Boyd*, 306 Ga. at 208 (1) (a). This enumeration of error fails.

(b) Barrett also argues that the trial court erred by not granting him a new trial, citing OCGA § 5-5-21, which provides that the trial judge "may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may

11

appear to be some slight evidence in favor of the finding." Barrett argues that the weight of the evidence presented at trial is contrary to the jury's verdict. Barrett's arguments, however, appear to conflate sufficiency of the evidence review under *Jackson v. Virginia*, with the role of the trial court sitting as a "thirteenth juror" under OCGA §§ 5-5-20 and 5-5-21. We have explained that

> [e]ven when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial — commonly known as the "general grounds" — require the trial judge to exercise a "broad discretion to sit as a 'thirteenth juror.'" In exercising that discretion, the trial judge must consider some of the things that [the trial judge] cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.

(Citation omitted.) *White v. State*, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013).

> The decision to grant or refuse to grant a new trial on the general grounds is vested solely in the trial court. And when a defendant appeals the trial court's denial of a motion for new trial, an appellate court does not review

12

the merits of the general grounds. Instead, this Court's review of [the] trial court's ruling on the general grounds is limited to sufficiency of the evidence under *Jackson v. Virginia.*

*Thrift v. State*, 310 Ga. 499, 503 (2) (852 SE2d 560) (2020) (cleaned up).

As discussed in the previous subdivision, the evidence was sufficient to support Barrett's convictions under *Jackson v. Virginia.* Moreover, because it is clear from the trial court's order denying Barrett's motion for new trial that the trial court properly understood its discretion to grant Barrett a new trial on the general grounds and that the trial court independently reweighed the evidence presented at trial, Barrett has not shown that the trial court erred with respect to its general grounds analysis. See *State v. Denson*, 306 Ga. 795, 799 (2) (a) (833 SE2d 510) (2019) (rejecting challenge to trial court's ruling on motion for new trial based on general grounds where the record showed that "the trial court understood the legal standard required to grant a motion for new trial on the general grounds and exercised its discretion in applying

13

that standard."). Accordingly, this enumeration of error is meritless.

2. Barrett also argues that the trial court erred by admitting into evidence an audio and video recording of his first custodial interview with law enforcement officers because technical difficulties with the recording made it difficult for the jury to understand what was discussed during the interview. Specifically, Barrett argues that the jury was unable to gauge his demeanor in the recording and that the probative value of the recording was therefore substantially outweighed by its prejudicial effect under OCGA § 24-4-403 ("Rule 403").

Barrett gave two custodial statements to law enforcement officers after the shooting. The first is the only one relevant to this enumeration of error. On February 17, 2016, Investigator Mitchell Freeman of the Richmond County Sheriff's Office interviewed Barrett. At trial, the State sought to admit a video recording of the interview. The prosecutor indicated to the court that there were technical difficulties with the recording, namely that the audio and video were not synchronized, "the recording play[ed] at an

14

unnaturally fast speed," and "the voices [were] accelerated[.]" Due to these difficulties, the prosecutor proposed playing only the audio portion of the recording for the jury. In response, Barrett argued that the State could instead manipulate the audio, resulting in the video and audio not "match[ing] up," and that playing only the audio would prevent the jury from analyzing body language and related visual factors. Barrett further argued that if the trial court decided to play the recording, then the jury should be informed of the technological modifications and also see the video. The prosecutor then suggested playing the recording for the jury twice, first at a slower speed and then at the accelerated speed caused by the malfunction. Barrett agreed with this suggestion, while still maintaining his earlier objection to the admission of the interview based on Rule 403. The trial court agreed that the State could play the recording twice, while noting that the jury should have some explanation for why the State was doing so. The recording was later played for the jury, first at full speed with audio and video, and then at a slower speed with audio only. The prosecutor explained to the

15

jury that the recording was played twice at different speeds due to technical difficulties with the recording.

Under Rule 403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" See also *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017). We generally review the trial court's decision to admit evidence for abuse of discretion. See *Carston v. State*, 310 Ga. 797, 802 (3) (b) (854 SE2d 684) (2021). As we have explained,

> Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility. Thus, in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.

(Citation and punctuation omitted.) Id.

As noted above, the content of the interview was highly probative of Barrett's guilt, as it helped to establish his presence at the scene of the murder with the other suspects and the victim and the motive for the crime. Although the recording of the interview may have been more difficult for the jury to understand than if there had been no technical difficulties, the jury had two opportunities to

16

view and evaluate the recording. In addition, Investigator Freeman testified at length about the interview and the incriminating statements Barrett made in it. The technical difficulties and extra time associated with playing the recording of the interview did not deprive the recording of probative value. Nor did it demonstrably create or enhance any improper prejudicial effect. Based on the foregoing, we see no abuse of the trial court's discretion in concluding that Rule 403 did not bar the admission of the video recording. See *Edwards v. State*, 308 Ga. 176, 183 (2) (839 SE2d 599) (2020) (trial court did not abuse its discretion in rejecting defendant's "conclusory assertion" that the probative value of a videotaped interview, in which defendant was cast "in a prejudicial light [but not] an *unfairly* prejudicial light," was substantially outweighed by the danger of unfair prejudice (emphasis in original)).

*Judgment affirmed. All the Justices concur.*

Decided October 19, 2021.

Murder. Richmond Superior Court. Before Judge Flythe.

*Frost & Carey, Tyler A. P. Carey*, for appellant.

*Jared T. Williams, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.