NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 11, 2024

S24A0293. McCABE v. THE STATE.
S24A0294. DUNSTON v. THE STATE.

ELLINGTON, Justice.

Dallas McCabe and Akhemu Dunston appeal their convictions for felony murder and criminal attempt to sell marijuana in connection with the shooting death of Joseph Jackson.[1] Both

---

[1] The crimes occurred on July 16, 2019. On March 10, 2021, an Oconee County grand jury indicted McCabe, Dunston, and Ryan O'Neal for malice murder, three counts of felony murder, and one count each of criminal attempt to commit robbery by force, criminal attempt to sell marijuana, and aggravated assault with a deadly weapon. O'Neal was also charged in the same indictment with possession of a firearm during the commission of a felony. By agreement of the parties, McCabe and Dunston were tried separately from O'Neal. (O'Neal was convicted of malice murder and the firearm offense, and we affirmed his convictions on appeal. See *O'Neal v. State*, 316 Ga. 264 (888 SE2d 42) (2023).) After a jury trial that ended on June 21, 2021, McCabe and Dunston were each found guilty on all counts with which they were charged except malice murder and aggravated assault. On that same day, McCabe and Dunston were each sentenced to serve life in prison for felony murder predicated on criminal attempt to commit robbery by force and a concurrent five-year prison term for criminal attempt to sell marijuana. The other two felony-murder counts were vacated by operation of law, and the charge of criminal attempt to commit robbery by force was merged into the felony-murder conviction. McCabe and

appellants contend that the evidence was insufficient to sustain the jury's verdicts and that the trial court erred by denying their motion for mistrial based on juror misconduct. McCabe separately contends that the trial court erred by denying his request to strike jurors for misconduct and that trial counsel rendered constitutionally ineffective assistance. Dunston separately contends that the trial court erred in failing to charge the jury more fully on proximate cause and in failing to sever his trial from McCabe's. For the reasons explained below, we affirm.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that Dunston, McCabe, and their co-indictee Ryan O'Neal drove to Jackson's home on the evening of July 16, 2019, with a plan to rob Jackson when they met him on the street in front of his home to sell him marijuana. As they were attempting

---

Dunston each filed a timely motion for new trial, which each amended on April 20, 2023, McCabe through new counsel and Dunston through his trial counsel. After a hearing on May 4, 2023, the trial court separately denied each amended motion for new trial on July 28, 2023. McCabe and Dunston each filed a timely notice of appeal, and the cases were docketed in this Court to the term beginning in December 2023 and submitted for a decision on the briefs.

to rob Jackson, McCabe drove off, and Jackson attempted to hold onto the car to retrieve his property. Jackson, who was dragged beside the car for about 100 yards, finally let go when O'Neal shot and fatally wounded him.

Dunston, his brother Quentin, and O'Neal had grown up together. The evidence shows that Dunston had sold marijuana to Jackson before. On the day of the shooting, Dunston messaged Jackson through Instagram, offering to sell him marijuana, and at 8:41 p.m., Jackson agreed to buy a certain amount for $30. Several minutes before 9:00 p.m., Dunston texted McCabe about taking part in a robbery – which he called "a money move" – that he believed would yield about $500. McCabe responded that he was "down for it" and instructed Dunston to "set it up." Prior Instagram communications between Dunston and McCabe revealed that they had previously discussed committing robberies, using slang terms like "lick" and "play." The record also shows that Dunston called O'Neal several times that day.

Soon after the sale of marijuana was arranged, McCabe drove

3

his car to pick up Dunston, O'Neal, and Quentin, and he took them to Jackson's home. Jackson lived with his grandparents in Watkinsville. Dunston was in the front passenger seat, O'Neal sat behind Dunston, and Quentin was in the rear driver-side seat. They arrived at about 9:45 p.m. and met Jackson on the street outside of his home. As Jackson inspected the marijuana, Dunston asked for Jackson's cell phone so that he could share his brother Isaiah's phone number with him. Jackson handed Dunston his phone, but Dunston did not return it, and McCabe began to drive off. Jackson jumped on the car and held on in an attempt to recover his property, but McCabe continued driving and dragging Jackson down the road. O'Neal shot Jackson through the rear passenger-side window, shattering the glass. Jackson's phone "flew" out the front passenger-side car window, and Jackson let go of the car.

Later that evening, a shirtless, shoeless, disoriented, and blood-covered Jackson knocked on his grandparents' back door. The record shows that Jackson's grandfather called 911 at 11:54 p.m. Police and emergency medical personnel responded immediately,

4

and Jackson was taken to the hospital, where he died the following day from his wounds. About 100 yards from Jackson's house, officers found on the side of the road Jackson's shirt, cell phone, and ring. Blood and shattered glass consistent with tempered glass from a car window were also on the ground in close proximity to Jackson's personal belongings. Jackson's grandfather testified that about $30 to $40 was missing from where Jackson normally kept his cash.

The medical examiner who performed the autopsy on Jackson's body observed abrasions over most of his body consistent with "road rash" or "prolonged contact" with pavement. She further testified that Jackson had a bruise on his left arm consistent with a sharp edge, like the top part of a car window, as well as blunt force injuries to his hands. She recovered a 9-millimeter bullet from his body. The medical examiner testified that Jackson died due to a gunshot wound to his chest, blunt-force head trauma, and massive blood loss.

On the day after the shooting, Dunston deleted his Instagram account. He also texted a friend to "tell [McCabe] he can't be driving his car like that [because] they [are] looking for a car with no back

5

window." After Dunston was arrested on July 30 for failure to appear in court on an unrelated charge, he told police officers that O'Neal shot Jackson when Jackson got upset following a drug deal. Dunston did not admit that he tried to rob Jackson, but did admit that he deleted his Instagram account the day after the shooting.

Just after midnight on August 1, officers found O'Neal hiding at a senior living facility in a closet of an apartment whose resident did not know he was there. The officers arrested O'Neal and found a 9-millimeter pistol and related ammunition in his possession. An expert in firearms examination and identification with the GBI determined that the gun obtained from O'Neal fired the bullet that killed Jackson. The firearms expert also determined that the pistol was in working order, would not fire unless the trigger was pulled, and required 7.25 pounds of pressure to pull the trigger.

After the shooting, McCabe fled Georgia and eventually traveled to Mexico, where he obtained a new phone number and created a social media account using an alias. On August 1, pictures of McCabe's car, which showed damage to the rear passenger-side

window, were taken by tag-reader cameras in Texas as McCabe drove through the state. McCabe was located by the FBI, arrested by Mexican authorities, and returned to the United States.

In a pre-trial interview, McCabe admitted driving his car during the murder. He contended, however, that Dunston had offered him $30 for a ride and that he had no idea there was going to be a robbery. McCabe said that Dunston took $30 from Jackson and tried to roll the car window up without giving Jackson any marijuana. McCabe admitted that Jackson grabbed onto his car and began beating on the window, that McCabe started to drive away, and that O'Neal shot Jackson, breaking the rear passenger-side window. McCabe said that he drove away because O'Neal and Dunston threatened him, McCabe knew they were gang members, and he was not. But McCabe's cell phone contained digital images of him posing with Bloods gang members and flashing gang signs while he was in Mexico. Dunston also revealed his Bloods gang affiliations in social media posts, and he and McCabe shared and understood the same Bloods slang. McCabe told the police that he had

7

abandoned his car after the incident, and it was never recovered.

Although Quentin was originally charged along with the others in connection with Jackson's murder, the charges were dismissed due to insufficient evidence against him. Quentin, who was granted immunity from prosecution, testified that O'Neal shot Jackson (although Quentin testified in O'Neal's trial that McCabe shot Jackson). Quentin said that O'Neal was "acting weird" and "talking crazy" and that O'Neal said he had taken the drug Xanax. Quentin also testified that McCabe was the driver. Quentin denied that Dunston attempted to take Jackson's phone, but Quentin was impeached with his pre-trial statement to the contrary.

1. Both McCabe and Dunston contend that the evidence was constitutionally insufficient to support the jury's verdicts.

> When evaluating the sufficiency of the evidence as a matter of federal constitutional due process, we view the evidence presented at trial in the light most favorable to the prosecution and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979)[.]

*O'Neal v. State*, 316 Ga. 264, 266 (1) (888 SE2d 42) (2023). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. (citation and punctuation omitted).

The co-defendants' felony-murder convictions were predicated on criminal attempt to commit robbery by force, a felony. Felony murder occurs when a person "causes the death of another human being irrespective of malice" during the commission of a felony. OCGA § 16-5-1 (c). "A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." OCGA § 16-4-1. A person commits robbery by force "when, with intent to commit theft, he takes property of another from the person or the immediate presence of another . . . [b]y use of force[.]" OCGA 16-8-40 (a) (1). And it is "unlawful for any person to . . . sell . . . marijuana." OCGA § 16-13-30 (j) (1). "Every person concerned in the commission of a crime is a party thereto and may

be . . . convicted of commission of the crime." OCGA § 16-2-20 (a). A person is a party to a crime if that person "[d]irectly commits the crime; . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b).

To convict McCabe and Dunston of felony murder, "the State was not required to prove that [either of them] personally fired the shot that killed" Jackson, only that each of them was a party to the crimes as defined in OCGA § 16-2-20 (b). *Frazier v. State*, 308 Ga. 450, 453 (2) (a) (841 SE2d 692) (2020). Moreover, McCabe and Dunston could be found guilty of felony murder even if neither of them intentionally aided or encouraged the shooting of Jackson, as long as each of them "was a party to the underlying felony that was a proximate cause of" Jackson's death. Id. "Proximate causation imposes liability for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause." Id. (citation and punctuation omitted).

(a) McCabe contends that the evidence was insufficient to

10

support the jury's verdicts because, although he associated with gang members, picked up his friends in exchange for gas money, and was asked to stop at Jackson's home for a marijuana sale, he was not involved in the planning or the sale itself. McCabe further argues that the shooting was an unplanned action by O'Neal alone and that there was no evidence that McCabe knowingly participated in, or was even aware of, a plan to rob, shoot, or harm Jackson in any way. Instagram messages introduced in evidence, however, showed that McCabe and Dunston planned a robbery less than an hour before they drove to Jackson's home. The evidence also shows that McCabe agreed to drive Dunston and O'Neal to the prearranged marijuana sale; that Jackson's phone was taken and forcibly retained before Dunston lost control of it at the scene; that McCabe drove away while Jackson was shot; and that McCabe fled the State and the country to avoid capture. This evidence authorized the jury to infer that McCabe shared with Dunston and O'Neal a common criminal intent to rob Jackson. See *Barrett v. State*, 312 Ga. 676, 680 (1) (a) (864 SE2d 403) (2021) ("[C]riminal intent may be inferred

11

from presence, companionship, and conduct before, during, and after the offense." (citation and punctuation omitted)).

A rational jury therefore could find McCabe guilty beyond a reasonable doubt, at least as a party to the crimes, of felony murder predicated on attempted robbery by force and of criminal attempt to sell marijuana. See *Perez v. State*, 316 Ga. 433, 438 (2) (888 SE2d 526) (2023) (holding that evidence was sufficient to find guilt of felony murder based on armed robbery where the testimony and evidence including text messages showed that the appellant and two co-indictees planned to rob the victim on the pretext of a marijuana transaction, that one co-indictee shot the victim prior to or contemporaneously with the taking of the marijuana, and that the three co-indictees fled); *Williams v. State*, 304 Ga. 658, 662 (1) (821 SE2d 351) (2018) (The appellant's "conduct before, during, after the offense supported the jury's conclusion that he shared an intent to commit an armed robbery of the victim," and "because the fatal shooting of an armed robbery victim may be said to be a probable consequence of the armed robbery, and all the participants in a plan

12

to rob are criminally responsible for the act of each committed in the execution of the plan and which may be said to be a probable consequence of the unlawful design, there was sufficient evidence for the jury to conclude that [the appellant] was a party to the crime of felony murder" predicated on criminal attempt to commit armed robbery. (citation and punctuation omitted)); *Menzies v. State*, 304 Ga. 156, 160-162 (II) (816 SE2d 638) (2018) ("[R]obbery is a dangerous business, and it carries the foreseeable risk that the intended victim may resist.").

(b) Dunston also challenges the sufficiency of the evidence supporting the jury's guilty verdict of felony murder predicated on attempted robbery by force.[2] Dunston argues that, at most, the evidence proved misdemeanor theft by taking, and not any form of robbery or attempted robbery, because any force occurred only after Jackson had given Dunston possession of the cash and the phone.

---

[2] Dunston also argues at some length that the evidence was not sufficient to find him guilty of the other two felony-murder counts. But these arguments are moot because those two counts were vacated by operation of law. See *Kimbro v. State*, 317 Ga. 442, 444 (2) n.5 (893 SE2d 678) (2023).

13

"Georgia follows the general rule that the force or intimidation essential to a robbery can either precede the taking or occur contemporaneously with it." *Doctor v. State*, 275 Ga. 612, 613 (2) (571 SE2d 347) (2002), overruled on other grounds by *Jones v. State*, 279 Ga. 854, 858 (3) (622 SE2d 1) (2005). See also *Perez*, 316 Ga. at 438 (2). In this case, in addition to the evidence recounted above, the evidence showed that Dunston rolled up the window just before or as McCabe drove off, from which the jury could infer an attempt to retain Jackson's cash and cell phone that was contemporaneous with the use of force – dragging Jackson down the road and shooting him – for that purpose. The jury was authorized to find that force was used against Jackson and he was killed both during and as part of a substantial step toward the ultimately unsuccessful taking of his property by force. See *Vergara v. State*, 287 Ga. 194, 196-197 (1) (c) (695 SE2d 215) (2010) (affirming an armed robbery conviction where the victim's cell phone was initially taken with his consent and, regardless of when the intent to take the phone arose, the theft was not completed until force was employed against the victim to divest

14

him of legal possession of the phone by preventing him from seeking its return). A rational jury therefore could find Dunston guilty beyond a reasonable doubt, at least as a party to the crimes, of felony murder predicated on attempted robbery by force. See id. at 197 (1).

2. Both McCabe and Dunston contend that the trial court erred by denying their motion for mistrial on the ground that jurors had discussed evidence prior to deliberations and expressed fear for their safety from being on the jury. McCabe separately contends that the trial court erred by denying his request to strike jurors who had prematurely discussed the evidence and were concerned for their safety. We reject both contentions.

Near the end of trial, after direct examination of the State's expert in criminal street gangs and gang activity, the trial court took a brief recess. Just before the recess ended, Juror J.D. submitted a note informing the trial court that another juror said she had dated a Bloods gang member. The trial court and the parties then questioned all of the jurors individually about conversations among the jurors during the recess. Juror M.D. admitted saying that she

15

had dated a Bloods gang member, and she reported that no juror responded to her comment. Juror J.D. said that some jurors discussed being "scared of gangs" and that Juror L.P. said she had recently requested police to "ride by" her home at night. Juror L.P. confirmed that she had made the request of police after she left her house door unlocked and found it open, and that she told the dispatcher she was serving on a jury, but that she had become "nervous" before the trial and "it's not necessarily related to the case." Juror J.C. said that she did not hear any conversation or say anything pertaining to this case, except that she mentioned she did not know if the jurors "need witness protection . . . [j]ust with the talk of the gangs" and that the only response was a "couple" of "smiles." She denied that she was commenting specifically on gang evidence in this case, but she felt "uncomfortable" about her safety if the case was gang-related. Juror D.C. reported that some jurors talked about gang terminology and symbols, which were used in the middle school she had attended, and that she had an "offhand" thought hoping that no one would see her on the jury and be "out for

16

revenge."

Several other jurors generally confirmed the responses of Jurors J.D., L.P., J.C., D.C., and M.D. about the conversations during the recess. All of the jurors who heard any of the conversations, as well as Jurors L.P. and D.C., confirmed that nothing discussed in the jury room would impact their ability to be fair and impartial. All of the jurors who were asked, including Jurors L.P. and J.C., specifically agreed that they would be able to base their verdict on the evidence and the law as instructed by the trial court. All of the jurors who were asked also agreed that none of the jurors discussed the facts of this case and that the mention of gangs in the jury room had nothing to do with the evidence in this case.

Dunston moved for a mistrial because the gang expert's testimony "irreparably poisoned" the jurors and caused them to be concerned for their safety, because they were discussing aspects of the evidence before being told to deliberate, and because it would be "naïve" to rely on the jurors' statements that they would not be affected. McCabe joined the motion for mistrial. The prosecutor

responded that the trial court observed the jurors' demeanor and could decide whether to believe their statements that they could set their concerns and the conversation aside and be fair and impartial. Immediately after the prosecutor's response, the trial court denied the motion for mistrial.

The State moved to dismiss Juror M.D. McCabe asked the trial court to excuse three additional jurors – Jurors L.P., J.C., and D.C. – if Juror M.D. was excused. When the trial court asked McCabe's trial counsel about a particular reason not to remove Juror L.P., McCabe's counsel said, "Okay. Fine then, we'll go with the other two, Juror [J.C.] and Juror [D.C.]" The trial court discussed Juror L.P. further but never ruled on the request to remove her. Dunston also asked the court to excuse Juror J.C. The trial court excused only Juror M.D. The court subsequently denied the motion to remove Juror J.C. after observing she said that two other jurors smiled at her "witness protection" remark and that she could still be a fair and impartial juror. The court then asked each of the co-defendants' counsel if he had "any other motions for any of the other jurors," and

each counsel separately answered in the negative. Before, during, and after the questioning of the jurors and the motion for mistrial, as well as during the rest of trial, the trial court repeatedly instructed the jury not to discuss the case.

(a) We review the denial of McCabe's and Dunston's motion for mistrial for abuse of discretion, "and the trial court's exercise of its discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Monroe v. State*, 315 Ga. 767, 775 (2) (884 SE2d 906) (2023) (citation and punctuation omitted). "To set aside a jury verdict solely because of irregular jury conduct, this Court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process." *Dixon v. State*, 302 Ga. 691, 694 (3) (a) (808 SE2d 696) (2017) (citations and punctuation omitted). "Any juror irregularity that has the potential to injure a defendant's due process rights triggers a presumption of prejudice, and the prosecution must then carry the burden of establishing beyond a reasonable doubt that no harm occurred." *Monroe*, 315 Ga. at 775 (2) (citation and

19

punctuation omitted).

> But as we have explained, the type of irregularity that gives rise to such a presumption of prejudice involves juror misconduct that has the potential to injure a defendant's due process rights, e.g., making an unauthorized visit to the crime scene and then presenting the findings to the jury panel; privately discussing the defendant's guilt prior to deliberations in violation of the court's instructions; or improperly accessing outside news sources.

*Dixon*, 302 Ga. at 695 (3) (a) (citation and punctuation omitted). "To establish that the juror irregularity was harmless beyond a reasonable doubt, the State must show based on the record evidence that there is no reasonable possibility that the juror irregularity contributed to the conviction." *Monroe*, 315 Ga. at 776 (2) (citation and punctuation omitted).

The record in this case shows that the jurors did not discuss the co-defendants' guilt or innocence or any particular evidence in the case, and the trial court implicitly credited the jurors' statements that neither their conversations nor their general safety concerns impacted their ability to be fair and impartial and to base

their verdicts on the evidence and the law.[3] See *Davis v. State*, 306 Ga. 430, 432-433 (831 SE2d 804) (2019) ("[I]n the absence of explicit factual and credibility findings by the trial court, we presume implicit findings were made supporting the trial court's decision."). There is no evidence to the contrary, and the trial court reminded the jurors not to discuss the case. We therefore are satisfied that the jurors' conversations and safety concerns – even assuming they amounted to misconduct triggering a presumption of prejudice –

---

[3] McCabe argues that, under OCGA § 24-6-606 (b) ("Rule 606 (b)"), the questioning of the jurors about the impact of their improper discussions on their verdict was not proper and cannot be relied on. See *Ballinger v. Watkins*, 315 Ga. 369, 380 (2) (b) n.11 (882 SE2d 312) (2022). In relevant part, Rule 606 (b) provides that, "[u]pon an inquiry into the validity of a verdict," although jurors may testify about whether they were improperly exposed to "extraneous prejudicial information" or "any outside influence," they may not testify, nor may their "statements be received into evidence," about "the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith." Rule 606 (b) does not apply where, as here, the problem was brought to the trial court's attention and the jury was questioned before the verdicts were reached. See *United States v. Sotelo*, 97 F3d 782, 797 (5th Cir. 1996) (Federal "Rule 606 (b) concerns the competence of juror testimony during 'an inquiry into the validity of a verdict.' Since the problem was brought to the court's attention prior to verdict, 606 (b) does not impact the availability of juror testimony in resolving the factual issues raised."); *Collins v. State*, 308 Ga. 608, 611 (2) (842 SE2d 811) (2020) ("Georgia's Rule 606 (b) is borrowed from Federal Rule of Evidence 606 and, as such, when interpreting its meaning, we are guided by the decisions of federal appeals courts[.]").

were harmless beyond a reasonable doubt and thus did not deprive him of his right to a fair trial. See *Dixon*, 302 Ga. at 694-695 (3) (a) (same holding where there was "simply no evidence that the conversation at issue . . . concerned [the appellant's] guilt or other impermissible subjects" and, "[i]n any event, after this conversation came to light, [one] juror was dismissed and the trial court reminded the jurors that they were not to discuss the case with anyone, including each other"); *Chenoweth v. State*, 281 Ga. 7, 12 (4) (a) (635 SE2d 730) (2006) (holding that "the jurors' answers to the trial court's questions" – that "there had been discussions about the evidence" but "they could put aside those prior discussions and decide the case based upon all the evidence presented at trial" and that "no conduct by any of the lawyers, the court, or the defendants . . . would impact their ability to fairly decide the case" – "show that the jurors' error in discussing the evidence was not so inherently prejudicial as to require a new trial"); *Holcomb v. State*, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997) (Where a juror's alleged statement "in violation of the trial court's instruction not to discuss the case . . .

did not involve deliberation of the case before the close of evidence, or a situation where one juror attempted to persuade another on any issue in the case . . . , we are satisfied that the juror's actions, while improper, were not so prejudicial as to have contributed to the conviction, and were harmless beyond a reasonable doubt."). See also *Harris v. State*, 314 Ga. 51, 55 (2) (875 SE2d 649) (2022) (OCGA § 24-6-606 (b) of our current Evidence Code "did not modify our longstanding substantive legal standards for assessing prejudice" in the case of juror misconduct). Accordingly, the trial court did not abuse its discretion in denying McCabe's and Dunston's motion for mistrial.

(b) McCabe argues that the trial court improperly denied his request to remove Jurors L.P, J.C., and D.C. However, McCabe acquiesced in the retention of Juror L.P. when he explained he would "go with the other two." See *Robinson v. State*, 299 Ga. 648, 651 (3) (791 SE2d 13) (2016) (The appellant's contention that the trial court erred by denying his request to remove a juror was not "preserved for purposes of appeal. Because [the appellant] acquiesced in the

trial court's action" by responding affirmatively when the trial court asked if he was satisfied with the questioning of the juror, the appellant could not "complain about the trial court's ruling."). Furthermore, McCabe never sought or received rulings on his requests to remove Jurors L.P. and D.C. McCabe has presented no authority that the issue was sufficiently preserved because, as asserted in his reply brief, the trial court "was not going to grant" or "would have denied" his request. "It is the duty of counsel to obtain a ruling on his motions or objections, and failure to do so will result in waiver for purposes of appeal." *Brooks v. State*, 309 Ga. 630, 638 (3) (847 SE2d 555) (2020) (citation and punctuation omitted). And plain-error review is not available for this issue. See *Miller v. State*, 309 Ga. 549, 552 (2) (847 SE2d 344) (2020). Consequently, the issue of whether Juror L.P. or Juror D.C. should have been removed from the jury was not preserved for either ordinary appellate review or plain-error review.

We turn then to the trial court's denial of McCabe's request to remove Juror J.C. from the jury. "OCGA § 15-12-172 vests the trial

court with broad discretion to replace a juror with an alternate at any point during the proceedings where, among other reasons, it is shown that the juror is unable to perform his or her duty or legal cause exists." *Morrell v. State*, 313 Ga. 247, 263 (3) (869 SE2d 447) (2022). "Whether to strike a juror for cause lies within the sound discretion of the trial judge, and the trial court's exercise of that discretion will not be set aside absent a manifest abuse of discretion." *Jones v. State*, 314 Ga. 605, 614 (3) (878 SE2d 505) (2022) (citation and punctuation omitted).

> To excuse for cause a selected juror in a criminal case on the statutory ground that her ability to be fair and impartial is substantially impaired, a challenger must show that the juror holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence.

*Morrell*, 313 Ga. at 263 (3) (citation and punctuation omitted).

Although Juror J.C. expressed some concern for her safety, she generally denied both that she overheard any conversation among the jurors or said anything herself pertaining to this case and that

25

she was commenting specifically on gang evidence in this case. Juror J.C. specifically affirmed that she did not feel so uncomfortable that she could not continue to serve as a juror, that she would be able to set aside that feeling and still base her verdict on the evidence and the law, and that she could make that decision without a concern of what might happen after the verdict. Under these circumstances, the trial court did not manifestly abuse its broad discretion in refusing to remove Juror J.C. See *Morrell*, 313 Ga. at 264 (3) ("[A]lthough [a] [j]uror . . . expressed doubts about her ability to remain impartial, she did not express a fixed opinion about [the appellant's] guilt or innocence. Nor did she unequivocally indicate that she would be unable to decide the case based upon the evidence presented at trial and the trial court's instructions. Under these circumstances, the trial court did not abuse its discretion in refusing to remove [the] [j]uror[.]"); *Dixon*, 302 Ga. at 695-696 (3) (a) (rejecting arguments both that, after the trial court dismissed one juror who talked about the case to another juror, a mistrial was required and that the second juror should have been dismissed,

26

where there was no evidence that the conversation at issue concerned the appellant's guilt and the trial court reminded the remaining jurors not to discuss the case); *Nwakanma v. State*, 296 Ga. 493, 500 (5) (768 SE2d 503) (2015) (Where the transcript showed that a juror "was 'worried' and 'afraid' that he could not be fair and impartial as a result of the allegation of gang activity[,] [n]othing in . . . [his] responses compelled a finding that he had formed an opinion of [the appellant's] guilt or innocence that was so fixed and definite that he would be unable to set that opinion aside and to decide the case based on the evidence and court's instructions.").

3. Dunston contends that the trial court erred by denying his motion to sever his trial from McCabe's. We see no abuse of the trial court's discretion.

> When two or more defendants are indicted jointly for a capital felony where the death penalty has been waived, for a non-capital felony, or for a misdemeanor, the defendants can be tried together or separately in the discretion of the trial court. See OCGA § 17-8-4 (a). A trial court has broad discretion to grant or deny a motion for severance. When ruling on the motion to sever, a trial court should consider three factors: (1) the likelihood of confusion of the evidence and law; (2) the possibility that

> evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses. To show that severance is required, the defendant must do more than point to the presence of antagonistic defenses or the possibility that he has a better chance of acquittal in a separate trial. Rather, he must show that a joint trial was so prejudicial as to amount to a denial of his right to due process.

*Henderson v. State*, 317 Ga. 66, 85 (7) (891 SE2d 884) (2023) (citations and punctuation omitted).

Dunston does not argue the factors of jury confusion or antagonistic defenses. Indeed, the jury was not likely to be confused about the evidence or the law because both Dunston and McCabe "were charged with the same offenses stemming from the same incident with largely the same evidence[,]" *Draughn v. State*, 311 Ga. 378, 387 (5) (858 SE2d 8) (2021), "and the State argued that they acted together in committing the crimes." *Henderson*, 317 Ga. at 85 (7). "For the same reason, there were no antagonistic defenses at trial." Id. In fact, both co-defendants blamed O'Neal for rogue conduct in shooting Jackson.

With respect to the remaining factor – evidence against one

28

defendant potentially being considered against the other defendant – Dunston argues that he was not charged with a violation of the Georgia Street Gang Terrorism and Prevention Act, OCGA §§ 16-15-1 to 16-15-11, and that evidence of his gang affiliation would not have been admissible if he had been tried separately because it had little or no probative value. But his gang affiliation was relevant to explain Dunston's highly probative Instagram messages that included planning of the attempted robbery. Those messages contained not only slang used by both Bloods gang members and other criminals, but also word usages and spellings that are unique to the Bloods gang and must be explained with reference to their gang context. For example, the letters "k" or "x" were used throughout the messages to replace "c" to show disrespect to the Crips, and "stain" referred to the rank of Bloods gang members, which is obtained by committing crimes. Thus, Dunston's gang affiliation was a relevant part of explaining the plan and motive for his criminal conduct. See *Blash v. State*, 318 Ga. 325, 336 (4) (898 SE2d 522) (2024) (holding that the testimony of an expert in "gang

language" explaining the meanings of various words and phrases in the defendant's jail phone call recordings was highly probative because it helped the jury understand the unfamiliar terminology in the calls, even though the defendant was not charged with criminal street gang activity); *Richardson v. State*, 308 Ga. 70, 72 (3) & n.5 (838 SE2d 759) (2020) (holding that expert testimony about the vernacular of the defendant's gang, including the replacement of the letter "c" with the letter "x" or "k," had significant probative value because it explained an otherwise largely incomprehensible personal letter written and sent by the defendant, even though he was not charged with gang activity); *Worthen v. State*, 306 Ga. 600, 606 (2) (832 SE2d 335) (2019) ("[E]vidence of gang membership may be relevant to show motive in a gang-related murder case even if the defendant is not charged under" the Street Gang Act. (citation omitted)). Given the admissibility of Dunston's gang affiliation to explain key evidence, as well as the absence of any showing that the jury was likely to be confused by the evidence and the law or that the co-defendants had antagonistic defenses, Dunston has failed to

make a clear showing that his "joint trial was so prejudicial as to amount to a denial of his right to due process." *Henderson*, 317 Ga. at 86 (7) (citation and punctuation omitted). The trial court therefore did not abuse its discretion in denying Dunston's motion to sever.

4. McCabe contends that his trial counsel provided constitutionally ineffective assistance in two ways: failing to move to sever his trial from Dunston's and failing to object to the State's improper closing argument. To prevail on a claim of ineffective assistance, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable

31

professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Scott v. State*, 306 Ga. 417, 419-420 (2) (831 SE2d 813) (2019) (citation and punctuation omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694 (III) (B). If a defendant fails to show either deficiency or prejudice, courts need not examine the other prong of the *Strickland* test. See *DeLoach v. State*, 308 Ga. 283, 287-288 (2) (840 SE2d 396) (2020).

(a) McCabe contends that his trial counsel was deficient in failing to file a motion to sever primarily because, he argues, it became clear that the State intended to introduce prejudicial gang evidence against Dunston that would not have been admissible at a separate trial of McCabe. We conclude, however, that counsel was not deficient because the decision not to move for severance was an objectively reasonable strategy.

As explained above in Division 3, the evidence of Dunston's gang affiliation was a relevant part of explaining the messages between him and McCabe that showed their plan and motive for the attempted robbery of Jackson. And McCabe has not argued, much less explained how, the probative value of that evidence was substantially outweighed by the risk of unfair prejudice under OCGA § 24-4-403. But, even assuming that evidence of Dunston's gang affiliation would not have been admissible against McCabe had he been tried separately, there is no clear showing of prejudice to McCabe in this joint trial given the evidence of his own association with the Bloods gang, which was admitted to attack the credibility of his statement that he fled the country due to threats from Bloods gang members like Dunston. See *Saylor v. State*, 316 Ga. 225, 231 (2) (887 SE2d 329) (2023) ("Even if some of the evidence related to [the co-defendants'] gang activities would not have been admissible against [the appellant] had he been tried separately, there is no clear showing that this evidence prejudiced him given the evidence of [the appellant's] gang membership."). The other factors to be

33

considered in addressing a motion to sever, jury confusion and antagonistic defenses, would not have supported a motion to sever filed by McCabe any more than they supported Dunston's motion to sever. See *Henderson*, 317 Ga. at 85-86 (7); *Draughn*, 311 Ga. at 387 (5).

Even if it would have been an abuse of discretion for the trial court to deny a motion to sever filed by McCabe, he has nevertheless not shown that his counsel was deficient. "Whether to seek a severance is a matter of trial strategy, and trial counsel's decision in this respect would constitute deficient performance only if it was so unreasonable that no competent attorney would have made that decision." *Wells v. State*, 307 Ga. 773, 777 (4) (838 SE2d 242) (2020) (citation omitted). McCabe's counsel testified that he decided not to seek severance because McCabe had given a detailed statement with many admissions and "if there was somebody else sitting at the table during the trial," counsel "could point the finger at that person and the jury may be more inclined to try to hold one person accountable and then that may end up benefitting Mr. McCabe . . . – to be

34

acquitted or at least maybe be convicted of some lesser charge."[4] This strategic decision was not so unreasonable that no competent attorney would have made it. See id. (The failure to file a motion to sever was not objectively unreasonable where "trial counsel testified that he did not file a motion to sever because he believed that the evidence against [the appellant] was more substantial than the evidence against his co-defendants, the best trial strategy was to deflect blame on them, and this strategy would work best if the other co-defendants were present.").

(b) McCabe also complains of his trial counsel's failure to object to repeated statements in the State's closing argument that it did not have to prove McCabe knew that a crime was going to be committed, only that he "participated." McCabe's counsel was not deficient in failing to object to this argument.

> A prosecutor is granted wide latitude in the conduct of closing argument. A closing argument is to be judged in the context in which it is made. Further, whether to object

---

[4] We note that one "[c]o-defendant['s] . . . use of testimony showing him to be less culpable than [the other co-defendant] does not make their defenses antagonistic and prejudicial." *Clark v. State*, 279 Ga. 243, 244-245 (3) (611 SE2d 38) (2005).

> to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance.

*Thompson v. State*, Case No. S24A0117, 2024 WL 1624637, at *6 (4) (b) (Ga., Apr. 16, 2024) (citations and punctuation omitted).

In addition to the statements of which McCabe complains, the prosecutor said, among other things, that the State did not have to prove that the co-defendants knew O'Neal had a gun, "that this was going to happen," or what was "in their minds"; but that the State did have to "prove their conduct," prove "that they knowingly participated," and "prove knowledge that a crime was being committed and that the person participated in the crime." We have held that the State must prove both that "the defendant knew a crime was being committed" and that "the defendant knowingly and intentionally participated or helped in the crime's commission[.]" *Eckman v. State*, 274 Ga. 63, 67 (3) (a) (548 SE2d 310) (2001). Consistent with *Eckman*, a reasonable jury could have understood the prosecutor in this case to be arguing that, although the State did

36

have the burden to prove knowing participation in a crime in order to prove each co-defendant's guilt as a party to the crime, it did not have to prove knowledge of O'Neal's possession of a gun, exactly what crimes other participants intended, or what specifically was going to happen. The prosecutor did not argue that it was unnecessary to prove either co-defendant had an intent to sell marijuana to Jackson (which was a required element of the convictions for attempted sale of marijuana) or to rob him (which was a required element of their convictions for felony murder predicated on attempted robbery by force). Moreover, the prosecutor repeatedly urged the jurors to "[l]isten carefully" to the trial court's instructions on what proof of knowledge and conduct was required. McCabe's trial counsel addressed the issue of knowledge in his closing argument, telling the jurors, among other things, that to find McCabe guilty of felony murder based on attempted robbery by force, they must find he "knew and was intending and participated somehow in this robbery of . . . Jackson"; that McCabe did not know anything about the planned sale of marijuana until it was already

37

in process; that he "didn't know about any of this going on"; that the prosecutor, despite her denials, was asking them to assume what McCabe "was thinking and what he knew"; and that the State had to prove beyond a reasonable doubt that McCabe "knew what was going to happen" and that he participated in it. The trial court had charged the jury that "[t]he closing arguments are not evidence," and during the final charge, the trial court gave the full pattern jury instruction on knowledge.[5] See Suggested Pattern Jury Instructions,

---

[5] The trial court charged the jury on knowledge as follows:

> Knowledge on the part of the defendant that a crime was being committed and that the defendant knowingly and intentionally participated in or helped in the commission of such crime must be proven by the State beyond a reasonable doubt.

> If you find from the evidence in this case that the defendant had no knowledge that a crime was being committed or that the defendant did not knowingly and intentionally commit, participate or help in the commission of and was not a conspirator in the alleged offense, then it would be your duty to acquit the defendant.

> On the other hand, should you find beyond a reasonable doubt that the defendant had knowledge that a crime was being committed and that the defendant knowingly and intentionally participated or helped in the commission of it, then you would be authorized to convict the defendant.

This instruction was immediately followed by the pattern charge on guilt by mere association:

> A jury is not authorized to find a person who was merely associated with other persons involved in the commission of a crime guilty of consent in or concurrence in the commission of the

38

Vol. II: Criminal Cases, § 1.43.10 (4th ed. 2007, updated Aug. 2020).

Given those instructions, and considering the parties' closing arguments related to the issue of knowledge in their entirety, we cannot conclude that McCabe's trial counsel was deficient for failing to object to the prosecutor's statements about knowledge. Even if an objection might have had some merit, a reasonable lawyer could have decided to rely on his own closing argument and on the trial court's charge on knowledge, instead of making an objection of questionable merit. See *Faulkner v. State*, 295 Ga. 321, 327 (4) (758 SE2d 817) (2014) ("A reasonable lawyer might well have decided that, rather than make an objection of questionable merit, she would rely on her own closing argument . . . and on the trial court's thorough charge on parties to a crime.").

5. Dunston contends that the trial court erred in failing to charge the jury more fully on the law of proximate causation. We

<hr>

crime[,] unless the evidence shows beyond a reasonable doubt that such person helped in the actual perpetration of the crime or participated in the criminal endeavor.

See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.43.31 (4th ed. 2007, updated Aug. 2020).

disagree.

Dunston argues that, given the reliance of his defense in large part on the question of whether Jackson's death was proximately caused by the criminal conduct alleged in the indictment and the importance of the jury's consideration of this factual question, the trial court should have given the civil pattern jury instruction regarding foreseeability and intervening cause, modified for the felony-murder context, or, alternatively, an instruction – based on *State v. Jackson*, 287 Ga. 646, 654 (3) (697 SE2d 757) (2010) – that to "find the defendant guilty of felony murder as charged in this indictment, you must find that the homicide was the reasonably foreseeable result of the criminal conduct alleged, and that there was no sufficient, independent, and unforeseen intervening cause." The trial court denied Dunston's alternative requests to give those instructions and instead gave the following charge, to which Dunston objected:

> In order for a homicide to have been done in the commission of a felony, there must be some connection between the felony and the homicide. The homicide must

have been done in carrying out the unlawful act and not collateral to it. It is not enough that the homicide occurred soon or presently after the felony was attempted or committed. There must be such a legal relationship between the homicide and the felony so as to cause you to find that the homicide occurred before the felony was at an end or before any attempt to avoid conviction or arrest for the felony. The felony must have a legal relationship to the homicide, be at least concurrent with it in part, and be a part of it in an actual and material sense. A homicide is committed in the carrying out of a felony when it is committed by the accused while engaged in the performance of any act required for the full execution of the felony.[6]

The trial court also properly defined felony murder for the jury as follows: "[A] person also commits the crime of murder when, in the commission of a felony, that person causes the death of another human being with or without malice." And the court instructed the

---

[6] This instruction was the pattern jury charge at the time of Dunston's trial. See *Wilson*, 315 Ga. at 735 (5) n.2; Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.10.30 (4th ed. 2007, updated Jan. 2017). That pattern instruction has since been revised. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.10.30 (4th ed. 2007, updated Aug. 2022) ("You may find the Defendant guilty of felony murder if you believe that he/she caused the death of another person by committing the felony of _____, regardless of whether he/she intended the death to occur. There must be some causal connection between the felony and the death. Felony murder is not established simply because the death occurred at the same time as or shortly after the felony was attempted or committed. The felony must have directly caused the death or played a substantial and necessary part in causing the death, regardless of when the death ultimately occurred.").

41

jury on the various predicate felonies that Dunston was charged with.

As Dunston acknowledges, we have affirmed convictions in other cases where the appellant complained of the same instruction, and Dunston has failed to distinguish his case from those prior cases. See *Wilson v. State*, 315 Ga. 728, 735 (5) (883 SE2d 802) (2023) (holding that, "taken together," the set of instructions set forth above "adequately informed the jury about the principles of proximate cause" that apply to felony-murder cases); *Stafford v. State*, 312 Ga. 811, 821 (4) (865 SE2d 116) (2021) ("An additional jury charge on unforeseen or intervening cause was unnecessary because, considered as a whole, the charge given by the trial court was a correct statement of the law with regard to proximate cause in a felony murder case."); *Ware v. State*, 305 Ga. 457, 459 (2) (826 SE2d 56) (2019) ("When viewed as a whole, these charges were sufficient to instruct the jury on the principles of proximate causation relevant to this case." (citation and punctuation omitted)). Indeed, Dunston has failed to identify any flaw in the charge as given or otherwise

make any argument why it was insufficient.

*Judgments affirmed. All the Justices concur.*